

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

## No. 02-21-00007-CV

_____

IN THE INTEREST OF M.S., A CHILD

---

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-585880-15

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. Introduction

The Department of Family and Protective Services brought suit against Mother to terminate her parental rights to her daughter Mary.[1]  Finding that Mother had constructively abandoned Mary and that termination was in Mary's best interest, the trial court terminated Mother's parental rights.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N), (b)(2).

Mother appealed, and in three issues, she asserts:

(1) the trial court erred by terminating Mother's parental rights because the evidence was legally and factually insufficient to support a finding that she had constructively abandoned Mary; *see id.* § 161.001(b)(1)(N);

(2) the evidence was legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship between Mother and Mary was in Mary's best interest; *see id.* § 161.001(b)(2); and

(3) the trial court erred in finding that appointing Mother as permanent managing conservator of Mary was not in Mary's best interest because the appointment would significantly impair Mary's physical health or emotional development.  *See id.* § 153.131.

We hold that the evidence is both legally and factually sufficient and overrule Mother's first two issues.  Because the trial court did not abuse its discretion by appointing the Department as Mary's managing conservator, we overrule Mother's third issue.  We affirm the trial court's judgment.

---

[1] We use an alias to identify the child, and we identify family members by their relation to the child.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

## II. BACKGROUND

### A. Procedural

#### 1. Mother becomes pregnant with Mary, and the Department investigates.

In October 2014, then fifteen-year-old Mother was reported as a runaway. When found in December 2014, Mother asserted that she had been kidnapped, drugged, and raped. Mother tested positive for marijuana and was pregnant with Mary. In 2015, Mother (by then sixteen years old) gave birth to Mary prematurely, and Mary's meconium tested positive for opiates. The Department opened an investigation but ruled out any neglect or abuse due to Mother's circumstances.

#### 2. Mother absconds with Mary, and the Department files its first termination petition.

In October 2015, after a Department worker lost contact with Mother, the worker went to Grandmother's home (where Mother was living) and learned that Mother had been missing for five days. Law enforcement found both Mother and Mary residing with a woman who had both a history with Child Protective Services and a current CPS case. Mother admitted to law enforcement that she had not fed Mary for two days because Mother had no formula. The Department filed its first petition to terminate Mother's parental rights to Mary in October 2015, and the trial court appointed the Department as Mary's temporary managing conservator that same month.

At some point, Grandmother's parental rights to Mother were terminated. Thus, in addition to Mary, Mother herself became a minor under the Department's conservatorship.

To address Mother's needs, the record shows that the Department prepared a service plan for her in December 2015 and again in February 2016. The record also shows Family Service Plan evaluations for March 2016, May 2016, July 2016, November 2016, and April 2017.

The trial court extended the dismissal date of the Department's first termination case in September 2016. *See id.* § 263.401. And in February 2017, the trial court signed a final order in which the Department and seventeen-year-old Mother were made Mary's joint managing conservators.

When a parent is a joint managing conservator, the Department's standard procedure is to have the parent work a service plan.[2] The purpose of continuing services is to address the concerns that brought the child into care and to help parents make the changes needed to return the child to the parents.

---

[2]A conservatorship caseworker assigned to Mary's case in July 2019 testified that she had prepared a service plan. The record, however, contains no "Family Service Plan" after February 2016. Family Service Plans focus on the parents. The record contains "Child Service Plans," which focus on the child, for December 2015, March 2016, November 2016, April 2017, October 2017, and March 2018.

4

### 3. The joint managing conservatorship continues for over two years.

After the February 2017 final order, the trial court conducted permanency hearings about every six months—May 2017, November 2017, April 2018, October 2018, and April 2019. The April 2019 permanency order stated that Mary's permanency goal was family reunification, permanent managing conservatorship to fictive kin, or adoption.

### 4. Citing Mother's lack of progress, the Department files its second "original" termination petition.

Before the next permanency hearing, in July 2019, the Department filed another "original" petition for termination.[3] By this time, Mother was twenty years old, and Mary was four years old. The affidavit supporting the petition explained why the Department was seeking termination:

> [Mother] was placed in foster care with the opportunity to be placed with her daughter. The Department was hopeful that [Mother] would be able to be prepared for independence by the time she aged out so that she could be a protective parent outside of CPS care[,] but [Mother] left care in May 2018. [Mother] was given a new service plan to work on. Since leaving care, [Mother] has not completed any tasks given to her on her service plan. [Mother] has not given proof of residence or proof of employment. [Mother] has not consistently visited with [Mary]. [Mother] has not addressed concerns about her ability to parent [Mary].

---

[3]Technically, the Department filed a motion to modify seeking termination. *See* Tex. Fam. Code Ann. § 156.001; *In re F.M.E.A.F.*, 572 S.W.3d 716, 723–24 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *In re E.K.C.*, 486 S.W.3d 614, 615 (Tex. App.—San Antonio 2016, no pet.).

More than a year later, in December 2020, the case proceeded to trial.[4] By December 2020, the Department had been Mary's temporary or joint managing conservator and Mary had been in the Department's care for over five years.

## B. Trial

### 1. Mother testifies.

Mother testified that she and Mary were initially removed from Grandmother's home. At first, Mother and Mary were in different placements, but the Department told Mother that it wanted to place them together.

The Department succeeded. Mother and Mary were placed in a group home with other teenage mothers who were the victims of sex trafficking. Mother stated that she loved that placement, but the home's license expired, so the Department had to find a new placement.

From there, Mother and Mary moved into a foster home. By this time, Mother was eighteen years old. According to Mother, this placement did not go so well; Mother explained that she "met the wrong guy," "snuck out of the house," and "did a couple of things that [she] shouldn't have." Mother said that she wanted to live independently with Mary and that the Department said that it would help her, but when the

---

[4]When filing the motion to modify seeking termination, the Department was already a joint managing conservator. Thus, the dismissal deadline associated with Section 263.401 of the Texas Family Code did not apply because the triggering mechanism—an order appointing the Department as temporary managing conservator—never occurred. *See* Tex. Fam. Code Ann. § 263.401(a).

independent living did not happen, Mother left the foster home. Mary, however, remained in the foster home.

From the foster home, Mother stayed with Great-grandmother. Staying with Great-grandmother did not work out either. Mother explained that she had to sleep on the floor and that she, Great-grandmother, and her "papaw" had conflicts, so Mother decided to try living on her own.

Meanwhile, Mary was moved to a foster home in Tyler. Because Tyler was so far away, visiting Mary became complicated. Mother would have to travel to the Department's Fort Worth office and meet with a caseworker, and that caseworker would drive Mother to Tyler. At the time of trial, Mary was in a different foster placement.

Mother admitted missing at least half her visits with Mary in the last year and that visits were part of her service plan. She acknowledged not completing counseling and that counseling was part of her service plan. Mother conceded not having completed her drug classes, although she asserted that she was in the process of completing them. By Mother's account, she was in her last week of ten weeks of drug classes. Mother admitted having used marijuana three weeks before trial and having used marijuana while taking her drug classes, but she asserted that she had used marijuana just that one time. According to Mother, she had completed her parenting classes and psychological evaluation. Regarding getting her GED, Mother stated that

7

she had taken the test four times and failed it each time, but her intention was to continue trying to get her GED.

Mother had a boyfriend. He was fifty-one years old. He had children, but his children did not live with him. Mother said, "I'm trying to get myself together[,] and he's trying to get himself together."

Mother stated that she got her own apartment in June 2020. Her boyfriend lived with her, and she and her boyfriend went half and half on the expenses. She claimed to have a full-time job working at Walmart Logistics. She explained, "Basically, I currently just got back on my feet. [Before getting my own apartment,] I was going from place to place, from sleeping . . . at my friend's house and not having a place to stay and getting up on my feet."

### 2. Susan Jensen (a caseworker and supervisor) testifies.

Susan Jensen was initially the conservatorship caseworker and was later the conservatorship supervisor for Mary's case from July 2015 until February 2020. Jensen asserted that the Department developed service plans for Mother that covered such things as parenting classes, individual counseling, family counseling, drug assessment, drug testing, drug education, a support group for sex-trafficked victims, appropriate housing, stable employment, and appropriate childcare. By Jensen's account, Mother had agreed to work services and had opportunities to have the service plans explained to her. Despite Mother's expressed willingness to work services, Jensen said that Mother failed to make any progress: "Mom has done some individual counseling, but

8

then she missed and did not go.  She did go for a couple of drug tests, but she missed the majority of them.  She did not consistently come to visits.  She did not have stable housing or stable employment."

Jensen described Mother and Mary's move from the group home for sex-trafficked victims to a foster home in a manner that differed slightly from Mother's version:

> [Mother] had been at a group home for sex[-]traffick[ed] victims with [Mary] where she was learning parenting skills.  She was finishing her GED.  She was working to complete that.  That group home was looking to get relicensed, and at that time it was decided between the case manager, [Mother], [and] the group home, that she was ready, kind of, for a step-down where she could go into a foster home, develop more normal skills, have more practice at her own parenting, still within a foster home setting, though, so she had guidance and support to meet those basic needs because she was not financially stable and did not have her own place to live and so she could continue with her schooling.

After Mother and Mary's move into the foster home, Jensen related the problems that followed:

> Approximately May 2018, [Mother] had left extended foster care and moved out of the foster home.  There w[ere] concerns that she was using marijuana; leaving the home and drinking alcohol; that she would leave [Mary] unattended overnight without letting [the] foster parent know, without having a babysitter or telling foster mom, and [Mother] would be gone for [eighteen] or more hours without coming back, wouldn't let [the foster mother] know; would go out of state; wasn't making her visits; concerns that she would come back with money and wouldn't be able to explain where she got it from; that she was getting in fights with her sister and with other people; [and] that she . . . test[ed] positive a couple times for marijuana use.

Mother's leaving the foster home for extended periods, Mother's leaving Mary behind when Mother left, and Mother's failure to tell anyone that she was leaving Mary unattended was a problem:

> Could be anywhere from [eighteen] hours to [thirty] hours. Leave in the middle of the night, so it was unknown that [Mary] was in the room unsupervised, by herself. That [Mary] would follow her downstairs[,] and the foster mom would find her crying because [Mother] would leave and she -- the foster mom was not aware that she was leaving at these times.

Jensen stated that Mother was not required to stay in the foster home, but if Mother left, she was not allowed to take Mary with her.

Mother admitted using marijuana and refused multiple times to take a drug test. She was supposed to get drug tested once a month, but she did not go for over a year between June 2018 and July 2019. The Department explained to Mother that if she did not go to the drug tests, the Department would presume that she would have tested positive; despite that, Mother continued not taking drug tests.

> After Mother left the foster care residence, the Department set up visits:

> Initially, they were set up weekly so [Mother] could have that weekly communication, and then after [Mother] wasn't able to make those visits weekly, it was discussed between her and the caseworker to attempt to do them every two weeks, so -- and having longer periods of time so she wouldn't necessarily miss them.

Jensen elaborated:

> After [Mother] left in May of 2018, she came for one visit in June, and then two visits in July and August, and then one visit in September, a visit in October, a visit in December of 2018. And then it was not until February 2019, and then April 2019, and then two visits in June of 2019. And then not again until January 2020 and February 2020.

10

In short, Jensen stated that Mother had missed over half of her visits.

Meanwhile, Mary was moved yet again. The Department placed Mary into a new foster home in August 2020.[5]

Jensen asserted that Mother was never able to show stability of any kind for her household. Employment and a stable income were part of Mother's service plan, but Mother never provided any documentation to show either. Jensen explained that to account for money, Mother would say that she would do hair or sell clothes and that she worked at the airport. Jensen concluded that Mother had not shown the ability to provide Mary with a safe and stable environment.

### 3. Lindsey Miller (another caseworker) testifies.

Lindsey Miller was Mary's caseworker from July 2019 until February 2020. Miller stated that she sent Mother a service plan by email in January 2020, Mother responded that she had received it, and she and Mother went over the service plan by email and phone calls. Miller said that maintaining contact with Mother was difficult and that she and Mother met face-to-face only once in November 2019. Miller stated, "We could never get . . . an exact address . . . ." Elaborating, Miller said:

> I would hear that she was -- I mean, be living with a friend. I think she often used -- I believe it was her grandmother's address, but I don't -- I could never really confirm if she was actually living there. She would tell

---

[5]The "Placement Review Report to the Court" for September 2020 (it was prepared in August but filed in September for the October hearing) provides simply: "[Previous caregiver] could no longer meet child's needs."

11

me that she's living in the Hulen area. She would be living with a friend, but she would be moving out soon to get her own place. I could never really pin down exactly where.

Mother's instability in housing concerned Miller. Mother also failed to show that she could maintain a steady income or employment.

Miller did not think that Mary should be returned to Mother: "[Mother] did not show that she could even maintain a steady relationship with her child, let alone be able to provide for a child full-time." Miller added, "[F]rom my portion of the case, [Mother] did not make any progress towards her service goals of getting stable, making that bond with her child, and really showing the Department that she could safely care for her young child."

### 4. Foster Mother testifies.

The Department placed Mary with Foster Mother in August 2020, so Foster Mother had had Mary about four months at the time of trial, and during that time Foster Mother said that Mary had bonded to Foster Mother, Foster Father, and the two other children in their home. Foster Mother described Mary as "a very happy child, but a little emotionally unstable." Foster Mother added, "She called everybody mom, everybody dad. She wasn't sure who her parents were."

Foster Mother said that Mother would cancel scheduled visits on the day of the visit or would just not show up. Foster Mother described the effect that Mother's missing scheduled visits had on Mary:

12

[Mary is] -- before we leave, she's trying to take her stuff because she thought she wasn't coming back. That's what -- anytime I explain to her about something [the Department has] going on, she -- she's not understanding. She's thinking, ["]Well -- Okay, well, I need to take my bike, I need to take this, and so on.["] I'll try my best to explain to her and prepare her for what's going to take place. So then I -- once I started preparing her, she was good until we got there and the visit didn't happen. So then she was, you know, crying, all emotional. But then once -- I just said, ["]We're not doing this anymore.["] I called and talked to [the caseworker]. I said, ["]We're not doing this anymore. We're not -- I'm not going to prepare her. We're going to just show up at the building and then see what happens then.["] But my five[-]year old, she knows everything, she's real smart, and she was like, ["]Oh, this is the place where [Mary's] mom is.["] So she ruined everything for me. So we get there, and then [Mary is] -- ["]Oh, oh, I'm going to go see [Mother].["] She says, ["]I'm going to go see [Mother,] and she's going to buy me cupcakes.["] So [my five-year old] ruined it all. So then we get there[,] and we go upstairs[,] and we wait, and [Mother] said, ["]I'm five minutes out, I'm 10 minutes out,["] and we sat there[,] and we waited, and then we [were] like, ["]We're leaving.["] I just -- half the time, I either left the visit or I either - - told [Mother], ["]Well, hey, you can just go ahead and visit this 30 minutes. But either way, at 5:00 o'clock[,] we're leaving.["]

Foster Mother said that initially Mary had trouble sleeping but that was no longer a problem.

### 5. Jermonica Glover (the current caseworker) testifies.

Jermonica Glover was Mary's current caseworker; Glover received the case in November 2020—about three and a half weeks before trial.[6] Glover went to Mother's two-bedroom apartment the day before trial and learned that Mother was living with someone else. Mother said that one of the bedrooms was reserved for Mary, but that

---

[6]A different caseworker had the case from February until November 2020. A fifth caseworker had the case for a couple weeks in July 2019.

bedroom was empty; it had no bed, no toys, and no clothes. Mother told Glover that she was employed and was working at a warehouse, but when Glover asked for check stubs or proof of employment, Mother could not provide any. Mother explained that she was still waiting for the company to provide proof on its website.

Glover did not recommend returning Mary to Mother:

> Just because of the consistency and -- just -- [Mary's] been in the system for five years, for her whole life, and right now it's time for her to get stability and -- stability with a home and a forever home, and different people are coming in and out of her life, and it's just time for her to just have stability and a forever home.

Glover testified that Mary was bonded with both foster parents and the other children in the home. Mary lived in a "nice home" in a "nice neighborhood," shared a bedroom with a sister, and had her own toys. The foster family provided a safe, stable, and loving home and was able to meet Mary's physical, emotional, and financial needs both now and in the future. The Department's plan for Mary was adoption, and the foster family was adoption motivated. Glover asked the court to terminate Mother's parental rights because termination was in Mary's best interest. Glover explained, "[Mary's] still little[,] and she's been in the system for her entire life[,] and it's time for her to have stability and get out of the system. I mean, it's just time for her to have a forever home and live a normal -- normal life."

# III. DISCUSSION

## A. Standard of Review Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently and—except for the child's right to inherit—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Thus, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Clear and convincing evidence must support the decision to terminate. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right,'" due process demands this heightened standard. *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). To be clear and convincing, evidence must "produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds listed in Family Code Section

161.001(b)(1), and (2) termination is in the child's best interest under Section 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B. Sufficiency Standards of Review

Mother's first two issues challenge the legal and factual sufficiency of the evidence supporting the trial court's findings. Before addressing her issues on their merits, we set out the standards of review.

### 1. Legal Sufficiency

When evaluating the evidence for legal sufficiency in termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam). We review all the evidence in the light most favorable to the findings and judgment, and we resolve any disputed facts in favor of the findings if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we must recognize that weighing a witness's credibility is the factfinder's province, not ours. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations provided they are not unreasonable. *Id.*

## 2. Factual Sufficiency

We must perform "an exacting review of the entire record" when determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency review, we give due deference to the factfinder's findings and do not supplant those findings with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated an alleged ground and that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## C. Scope of Evidentiary Review

In Mother's reply brief, relying on Section 161.004 of the Texas Family Code, she argues for the first time that our sufficiency review is restricted to evidence that occurred after the February 2017 final order. *See* Tex. Fam. Code Ann. § 161.004 ("Termination of Parental Rights After Denial of Prior Petition to Terminate").[7] She

---

[7] Section 161.004 provides:

complains that the Department, in its response brief, transgressed Section 161.004 by relying on events that occurred before February 2017.[8]

(a) The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:

(1) the petition under this section is filed after the date the order denying termination was rendered;

(2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;

(3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and

(4) termination is in the best interest of the child.

(b) At a hearing under this section, the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

Tex. Fam. Code Ann. § 161.004; *see In re S.B.*, No. 02-18-00310-CV, 2019 WL 1388760, at *4 (Tex. App.—Fort Worth Apr. 25, 2019, pet. denied) (per curiam) (mem. op.).

[8]Section 161.004 makes its first appearance in Mother's case in her reply brief. At the trial-court level, Section 161.004 played no role at all. In the Department's petition, in Mother's answer, and in the termination judgment, Section 161.004 is never cited. At trial, Section 161.004 was never mentioned. Even the trial court's findings of fact and conclusions of law are silent regarding Section 161.004. At the appellate level, neither Mother in her original brief nor the Department in its response brief cited Section 161.004. Arguably any reliance on Section 161.004 was waived or not preserved. *See In re T.B.*, 594 S.W.3d 773, 778 (Tex. App.—Waco 2019, no pet.) (holding that complaint was not preserved because it was not raised at trial); *Pineridge Assocs., L.P. v. Ridgepine*, LLC, 337 S.W.3d 461, 472 n.10 (Tex. App.—Fort Worth 2011, no pet.) (stating that arguments raised for the first time in a reply brief are waived). The gist of Mother's complaint, though, is the scope of what we consider when determining

As our trial summary shows, the Department sought termination based on Mother's conduct after the February 2017 final order. At trial, on the basis of res judicata (and not on the basis of Section 161.004), Mother actively sought to preclude evidence that predated the February 2017 final order. She objected to one of the Department's witnesses because virtually all that witness's knowledge predated the February 2017 final order, and the trial court refused to hear that witness's testimony. Later, Mother objected to another witness's testimony to the extent that this witness addressed events predating February 2017, and the trial court sustained Mother's objection. In a third instance, the trial court overruled Mother's objection because that particular piece of evidence had already been admitted without objection. Consequently, to the extent that the Department attempted to address matters before the final order, Mother objected.

In her reply brief, Mother's primary complaint is with the Department's discussion of the procedural history, which it placed under the rubric "Statement of Facts." The Department also relied on the clerk's record to flesh out its family service plan discussion.

We too have looked at the procedural history. The procedural history is precisely what gave rise to Mother's res judicata objection at trial and her Section 161.004

---

her sufficiency complaints (independent of any reliance on Section 161.004), which Mother asserts the Department has improperly expanded. Resolving Mother's sufficiency complaints necessarily requires resolving that issue, so we will address it.

argument here on appeal. Unlike the State, we have separated our review of the procedural history from our review of the evidence presented at trial.

We agree with Mother to the extent that our sufficiency review is limited to the evidence presented at trial. *See In re J.D.*, 436 S.W.3d 105, 121 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Despite the confusion, the Department appears to agree with this proposition as well. Under the heading "Argument," the Department's response to Mother's first issue is: "The evidence presented at trial was legally and factually sufficient to support the trial court's finding that [Mother] constructively abandoned [Mary]." And in response to Mother's second issue, the Department asserted: "The evidence presented at trial was legally and factually sufficient to support the trial court's finding that termination is in [Mary's] best interest." As discussed below, the evidence presented at trial focused on events following the February 2017 final order.

## D. Constructive Abandonment

In Mother's first issue, she challenges the legal and factual sufficiency of the evidence supporting the trial court's constructive-abandonment finding. For the reasons set out below, we overrule Mother's first issue.

### 1. The Law

The Department proves that a parent has constructively abandoned a child by showing that

the child . . . has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:

> (i) the department has made reasonable efforts to return the child to the parent;

> (ii) the parent has not regularly visited or maintained significant contact with the child; and

> (iii) the parent has demonstrated an inability to provide the child with a safe environment[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(N); *accord In re F.E.N.*, 542 S.W.3d 752, 766 (Tex. App.—Houston [14th Dist.] 2018), *pet. denied*, 579 S.W.3d 74 (Tex. 2019) (per curiam). "The first element focuses on the Department's conduct; the second and third elements focus on the parent's conduct." *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *accord In re C.E.P., III*, No. 01-19-00120-CV, 2019 WL 3559004, at *17 (Tex. App.—Houston [1st Dist.] Aug. 6, 2019, no pet.) (mem. op.).

### 2. Discussion

#### a. Reasonable Efforts

When reviewing whether sufficient evidence supports termination under Section 161.001(b)(1)(N), the issue is whether the Department made reasonable efforts, not ideal efforts. *See In re M.V.G.*, 440 S.W.3d 54, 61 (Tex. App.—Waco 2010, no pet.); *In re G.K.G.A.*, No. 01-16-00996-CV, 2017 WL 2376534, at *5 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.). When the Department removes a child, it

designs a family service plan to reunify the parent with the child. *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 795 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Preparing and administering a service plan for the parent constitutes evidence that the Department made reasonable efforts to return the child to the parent. *See, e.g., In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.).

The testimony showed that the Department prepared family service plans for Mother (even if the service plans after February 2017 were not introduced into evidence), and for about five years, the Department made reasonable efforts to help Mother stabilize her life with the goal of safely reunifying Mary with Mother. Mother does not dispute that she had service plans; just the opposite, Mother asserted that she tried to work her service plans. Thus, the trial court could have found that the Department had made reasonable efforts to return Mary to Mother. *See In re M.R.J.M.*, 280 S.W.3d 494, 505–06 (Tex. App.—Fort Worth 2009, no pet.).

### b. Regular Visits and Significant Contact

The Department placed Mother and Mary together. In May 2018, Mother left both foster care and Mary. After Mother left foster care, she missed more than half her visits with Mary. For the next two and one-half years, Mother's contact with Mary was sporadic and chaotic. Therefore, the trial court could have found that Mother failed to visit or maintain significant contact with Mary. *See In re K.G.*, 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied).

22

### c. Inability to Provide Child a Safe Environment

Courts have applied the Section 263.307(b) factors when conducting a "safe environment" analysis in the context of constructive abandonment. *In re G.P.*, 503 S.W.3d 531, 533–34 (Tex. App.—Waco 2016, pet. denied); *In re N.A.V.*, No. 04-19-00646-CV, 2020 WL 1250830, at *7 (Tex. App.—San Antonio Mar. 17, 2020, pet. denied) (mem. op.). Section 263.307(b) provides:

> (b) The following factors should be considered by the court and the department in determining whether the child's parents are willing and able to provide the child with a safe environment:
>
> (1) the child's age and physical and mental vulnerabilities;
>
> (2) the frequency and nature of out-of-home placements;
>
> (3) the magnitude, frequency, and circumstances of the harm to the child;
>
> (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;
>
> (5) whether the child is fearful of living in or returning to the child's home;
>
> (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;
>
> (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;
>
> (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;
>
> (9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

   (A) minimally adequate health and nutritional care;

   (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

   (C) guidance and supervision consistent with the child's safety;

   (D) a safe physical home environment;

   (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

   (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

Tex. Fam. Code Ann. § 263.307(b).

After separate placements and then being placed together in a home for sex-trafficked children, Mother and Mary were placed together in a foster home, but Mother would run off without telling anyone and without arranging for anyone to take care of Mary. Eventually Mother left both the foster home and Mary, and for about the next two years, Mother lived what appears to have been a nomadic existence.

24

Six months before trial, Mother finally had an apartment—an apartment that she shared with a man thirty years her senior and whom Mother described as a person seeking stability himself, not as a person having stability. While taking drug classes, Mother used drugs. A reasonable factfinder could have credited Mother's recent progress as steps in the right direction, but a reasonable factfinder could also have concluded that these steps were nevertheless insufficient to negate years of unsafe conduct. "Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices." *In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied). "While the recent improvements made by [the parent] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). As with the other elements, the record supports the trial court's finding that Mother was not able to provide Mary a safe environment. *See K.G.*, 350 S.W.3d at 354–55; *M.R.J.M.*, 280 S.W.3d at 505–06.

### 3. Conclusion

We hold that the evidence sufficed both legally and factually to support the trial court's (N) finding. *See J.F.C.*, 96 S.W.3d at 265–66 (stating that to be legally sufficient, the evidence must be such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations); *C.H.*, 89 S.W.3d at 25 (stating that to be factually sufficient, on the entire record, a factfinder must be able to

25

reasonably form a firm conviction or belief that the parent violated an alleged ground). We overrule Mother's first issue.

## E. Best Interest

In Mother's second issue, she challenges the legal and factual sufficiency of the evidence supporting the trial court's best-interest finding. As set out below, we hold that the evidence is legally and factually sufficient and overrule Mother's second issue.

### 1. The Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence that is probative of grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the factfinder in a termination case may also use in determining the child's best interest include:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.); *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

## 2. Discussion

### a. The Child's Desires

At the time of trial, Mary was only five years old. As such, she did not possess sufficient maturity to express an opinion regarding a parental preference, and she did not testify at trial. *See In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.); *see also* Tex. Fam. Code. Ann. §§ 153.134(a)(6) (providing that a child must be at least twelve years old before the child's preference, if any, regarding the person to have

27

the exclusive right to designate the child's primary residence becomes a factor); 156.101(a)(2) (same). This factor is thus neutral.

### b. The Child's Emotional and Physical Needs

Mother did not show that she could meet Mary's emotional or physical needs. Foster Mother recounted how Mother's failure to visit Mary consistently caused Mary emotional turmoil. A child needs a home, and although Mother's case had been going on for five years, Mother purportedly procured an apartment of her own only months before trial, and Mary's proposed bedroom within that apartment was unfurnished. In contrast, the foster and proposed adoptive home was meeting both Mary's emotional and physical needs. Glover, Mary's current caseworker, said, "[Mary is] doing very good. She's full of joy. . . . [S]he's just a happy kid." This factor supports the trial court's best-interest finding.

### c. The Emotional and Physical Danger to the Child

Mother had endangered Mary emotionally and physically. Mother's inconsistent visits caused an emotional toll on Mary, and when Mother and Mary were housed together in a foster home, Mother would sneak out of the house without alerting anyone that she had left Mary unattended. By comparison, Mary had emotionally bonded to the foster and proposed adoptive family, and Foster Mother intervened to promote Mary's safety when she thought that Mother was harming Mary by missing visits. This factor favors the trial court's best-interest finding.

28

### d. The Parental Abilities of the Individuals Seeking Custody

Mother had not shown an ability to parent Mary. Just the opposite, Mother had shown an inability to parent. Foster Mother, however, had parented her other children and was parenting Mary. This factor, like the others, supports the trial court's best-interest finding.

### e. The Programs Available to Assist These Individuals to Promote the Child's Best Interest

Jensen, the caseworker and supervisor who had worked with Mother for about five years, stated that Mother's participation in services that were designed to help her parent Mary was inconsistent and that Mother had failed to show any progress. Mother was in classes to address drug abuse at the time of trial, and while in those classes, she nonetheless used drugs. After four attempts at getting her GED, Mother still had not passed it. Based on this track record, the trial court could thus conclude that even if programs were made available to Mother, the programs would not benefit her. This factor weighs in favor of the trial court's best-interest finding.

### f. The Plans for the Child by These Individuals or by the Agency Seeking Custody

Mother ostensibly planned to move Mary into the apartment that she shared with her fifty-one-year-old boyfriend. Because Mary's bedroom was as yet unfurnished with furniture, clothing, or toys, presumably Mother planned on providing those too. Casting a cloud over these plans, however, was Mother's failure to provide any proof of employment. If adopted by the foster family, Mary would live in a "nice home" in a

"nice neighborhood," would share a bedroom with a sister, and would have her own toys. Given Mother's history of moving and given the questions surrounding her employment, this factor buttresses the trial court's best-interest finding.

### g. The Stability of the Home or Proposed Placement

Mary had spent virtually her entire life in foster placements. Mary was now in a placement that was adoption motivated. By this point, Mother represented a destabilizing influence on Mary. Mother's visits were unpredictable, and Mother saw herself as a vagabond. Unstable herself, Mother had no stability to offer Mary. Mother became an impediment to Mary's stability. "[C]hildren need permanency and stability." *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied). A child's need for permanence through the establishment of a stable, permanent home is a paramount consideration in the best-interest determination. *In re. E.R.W.*, 528 S.W.3d 251, 267 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Once again, this factor supports the trial court's finding that termination was in Mary's best interest.

### h. The Parent's Acts or Omissions that May Indicate that the Existing Parent-Child Relationship is Not a Proper One

Mother exhibited behaviors inconsistent with an appropriate parent-child relationship. Rather than stay in a foster home with Mary to learn the skills needed to live and to parent independently, Mother sneaked out of the home without arranging for anyone to care for Mary. Further, Mother left the foster home and eliminated any

possibility of parenting Mary on a day-to-day basis. This factor favors the trial court's best-interest finding.

### i. The Parent's Excuse, if Any, for the Acts or Omissions

Faulting Mother seems unfair. She was young, and her history was turbulent and traumatic. Yet our focus is on what is in Mary's best interest, and in this instance, Mother's youth and troubled past, which years of services failed to compensate for, are factors weighing in favor of the trial court's best-interest finding.

### 3. Conclusion

Viewing the evidence in the light most favorable to the trial court's finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination was in Mary's best interest and thus that the evidence was legally sufficient. *See J.F.C.*, 96 S.W.3d at 266. And when viewing the evidence equally, in light of the entire record and while giving due deference to the trial court's findings, we hold that a reasonable factfinder could have reasonably formed a firm belief or conviction that the termination was in Mary's best interest and, therefore, that the evidence is factually sufficient as well. *See id.*; *C.H.*, 89 S.W.3d at 26. We overrule Mother's second issue.

## F. Mother's Third Issue

In issue three, Mother argues that the trial court erred by finding that appointing her as permanent managing conservator of Mary was not in Mary's best interest because the appointment would significantly impair Mary's physical health or emotional development. S*ee* Tex. Fam. Code Ann. § 153.131(a) ("[U]nless the court finds that

31

appointment of the parent . . . would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator . . . of the child."). Ignoring Mother's reliance on Section 153.131, the Department responds that the record supports the trial court's determination that appointing it as Mary's managing conservator was in Mary's best interest. *See In re T.M.*, No. 02-19-00329-CV, 2020 WL 523272, at *5 (Tex. App.—Fort Worth Feb. 3, 2020, no pet.) (mem. op.). We agree with the Department.

The trial court made a Section 153.131 finding. We first address where the Section 153.131 finding fits in the context of Mother's case.

Section 153.131 applies when parental rights have not been terminated. *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *15 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.); *In re E.R.*, No. 01-17-00503-CV, 2017 WL 5892402, at *13 (Tex. App.—Houston [1st Dist.] Nov. 30, 2017, pet. denied) (mem. op.); *In re M.M.M.*, No. 01-16-00998-CV, 2017 WL 2645435, at *17 (Tex. App.—Houston [1st Dist.] June 16, 2017, no pet.) (mem. op.); *In re S.N., Jr.*, Nos. 05–16–01010–CV, 05-16-01033-CV, 05-16-01034-CV, 05-16-01035-CV, 2017 WL 2334241, at *5 (Tex. App.–Dallas May 30, 2017, no pet.) (mem. op. nunc pro tunc).[9] When the

_____

[9]*See In re S.N., Jr.*, Nos. 05-16-01010-CV, 05-16-01033-CV, 05-01034-CV, 05-16-01035-CV, 2017 WL 3435599, at *5 (Tex. App.—Dallas Jan. 18, 2017, pet. denied) (mem. op.).

32

termination is reversed, the presence or absence of a Section 153.131 finding plays a role. *See In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam); *In re J.A.J.*, 243 S.W.3d 611, 612–13, 617 (Tex. 2007).

Here, though, Mother's termination remains intact. When a trial court terminates a birth parent's parental rights, the birth parent is no longer the "parent" under the Texas Family Code. Tex. Fam. Code Ann. § 101.024(a); *In re N.B.*, No. 05-15-00671-CV, 2015 WL 6437681, at *5 (Tex. App.—Dallas Oct. 23, 2015, pet. denied) (mem. op.). More specifically, Mother is no longer a "parent" under Section 153.131. *See* Tex. Fam. Code Ann. §§ 101.024(a), 153.131.

When a trial court terminates a birth parent's rights, Section 161.207 controls the appointment of a managing conservator. *P.M.B.*, 2017 WL 6459554, at *15; *E.R.*, 2017 WL 5892402, at *13; *M.M.M.*, 2017 WL 2645435, at *17; *S.N., Jr.*, 2017 WL 2334241, at *5. After termination, the trial court appoints "a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a).

We review a trial court's appointment of a non-parent as managing conservator for an abuse of discretion. *T.M.*, 2020 WL 523272, at *5. Thus, we may reverse the trial court's appointment of a non-parent as managing conservator only if we determine that the trial court acted arbitrarily or unreasonably. *Id.*

When determining issues of conservatorship, the primary consideration is the best interest of the child. Tex. Fam. Code Ann. § 153.002; *T.M.*, 2020 WL 523272, at

*5.  And when determining a child's best interest in the context of conservatorship decisions, we may use the *Holley* factors, listed above in the context of best interest and termination.  *T.M.*, 2020 WL 523272, at *5.  Unlike the burden of proof necessary to support the termination of parental rights (clear and convincing), the burden of proof necessary to appoint a non-parent as managing conservator is a mere preponderance of the evidence.  *See id.*

Because Mother's parental rights were terminated, Section 161.207—not Section 151.131—applies.  *See P.M.B.*, 2017 WL 6459554, at *15.  Mother has thus failed to show that the trial court abused its discretion by appointing the Department as Mary's managing conservator.  *See M.M.M.*, 2017 WL 2645435, at *17.  We have previously held that the Department met its clear-and-convincing burden to show best interest in the context of termination, so it follows that the Department met the lower preponderance-of-the-evidence burden to show best interest in the context of conservatorship.  Having terminated Mother's parental rights, the trial court acted neither arbitrarily nor unreasonably by appointing the Department as Mary's managing conservator.  *See T.M.*, 2020 WL 523272, at *5.  We overrule Mother's third issue.[10]

---

[10]The State has not contested Mother's standing to attack conservatorship issues after termination.  We note, however, that there are several cases holding that a terminated parent has no standing.  *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *31 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet. h.) (mem. op.); *In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *26 (Tex. App.—Houston

## IV. CONCLUSION

Having overruled Mother's three issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: May 6, 2021

---

[1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.); *In re C.E.C.*, No. 05-17-01482-CV, 2018 WL 3062454, at *8 (Tex. App.—Dallas June 21, 2018, no pet.) (mem. op.).